# United States Court of Appeals
## For the First Circuit

No. 06-2185

UNITED STATES OF AMERICA,

Appellant,

v.

GARY JAMES MILO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Dyk,[*] Circuit Judges.

Jennifer Hay Zacks, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellant.
Robert L. Sheketoff for appellee.

October 30, 2007

---

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN, Chief Judge.** This is an appeal by the government contesting the sentence imposed by the district court on Gary Milo. Milo was arrested in 2003 for trafficking in marijuana. He thereafter agreed to plead guilty and assist the government in pending investigations. The government in turn agreed, subject to getting substantial cooperation, to file a motion for a reduced guideline sentence, U.S.S.G. § 5K1.1, and a sentence below the mandatory minimum, 18 U.S.C. § 3553(e) (2000).

On April 29, 2004, Milo pled guilty to a sealed one-count information alleging conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846 (2000). The information described Milo's role in heading a large-scale marijuana distribution operation in Massachusetts, spanning four years and involving "1,000 kilograms or more" of marijuana. Forfeiture of Milo's proceeds from the operation was sought as well. 21 U.S.C. § 853.

As is common in such cases, sentencing was deferred while Milo assisted investigators. In May 2006, the cooperation having been completed, the probation officer prepared the pre-sentence report, and the government filed its promised motion. The PSR found Milo accountable for over 6,000 kilos of marijuana; it found that the conspiracy had been an extensive one involving five or more participants; and it found that Milo himself had directed at least two individuals to transport marijuana or drug proceeds. It

also noted that while under supervision Milo had tested positive for cocaine on one occasion.

Milo, born in 1955, was described in the PSR as having been brought up in an upper middle class home, although it said that he had suffered some abuse. He was married, had attended but not graduated from college and had learned building design from his father. He had a builder's license and a realtor's license and had worked in both fields and estimated his income (apart from drugs) at $50,000 a year. His estimated net worth slightly exceeded $2.5 million.

The PSR calculated the mandatory minimum sentence as 10 years, 21 U.S.C. § 841(b)(1)(A)(vii), and the guidelines range as 151 to 188 months. The calculation reflected a base offense level of 34 premised on the 6,000 kilos and no prior criminal history. An upward three-level adjustment for role in the offense matched an equal reduction for acceptance of responsibility. U.S.S.G. §§ 3B1.1(b), 3E1.1. Milo objected that the kilo amount was overstated; the probation officer said that it did not affect the calculation.

In its promised motion, the government described Milo's cooperation in a number of different investigations. The government moved both for relief from the mandatory minimum, 18 U.S.C. § 3553(e), and from the otherwise applicable guideline sentence, U.S.S.G. § 5K1.1, and proposed to recommend a sentence of

75 months, approximately half of the guideline minimum as calculated by the probation officer.

Letters were submitted by those who knew Milo. They described him (with detailed examples) as a caring and decent person, helpful to others; set forth his work since his arrest for Habitat for Humanity and other charitable endeavors; attested to his contrition; expressed confidence that he would never repeat his crime; and, in many cases, expressed hope that he would not have to serve time in prison.

At sentencing, Milo's experienced counsel said he had seen few examples of such complete remorse and urged that Milo be given no time in prison. The prosecutor agreed that Milo had done "a great job" and helped the government "in significant and important ways." But, she said, Milo had brought thousands of pounds of marijuana into the district over a number of years, and 75 months was a "generous" reduction from the ordinary guideline sentence.

After Milo spoke, expressing contrition and saying that he had sought to turn his life around, the district court said that it would accept defense counsel's recommendation. The judge referred without elaboration to Milo's "extraordinary" cooperation and the force of the letters in the record and said that the 18 days already spent by Milo in detention and the prospect of a very large forfeiture yet to be computed counted as punishment.

The court then sentenced Milo to time served, five years of supervised release with the first six months to be served in a community corrections facility, and a fine of $50,000. Thereafter, in denying a government motion for reconsideration, the district court rejected any suggestion that the government should have been surprised by the sentence and elaborated on what the court said was already in the record before the sentencing hearing:

> The sentencing concerned the extraordinary nature of Mr. Milo's cooperation as described in the government's presentation. But it also concerned the extent to which Mr. Milo had changed his life, the steps he had taken in his work, steps which effectively increased the amount of money the government was likely to recover on forfeiture, and his exemplary work with Habitat for Humanity.

In discussing the government's objections, the court said that the Milo sentencing was about contrition as well as cooperation; that many defendants bargain and cooperate as a kind of "business arrangement" but that Milo was genuinely remorseful and "had changed his life (addressing his addictions, working for Habitat for Humanity, etc.)." The court referred briefly to the large forfeiture judgment expected. It agreed with defense counsel that Milo was "someone who the Court will never see again."

The government has now appealed to this court, arguing primarily that the sentence is unreasonably low: specifically, that "the district court sentenced a major marijuana dealer to time-served . . . an 18-day term of imprisonment" even though Milo

participated in an extensive four-year drug conspiracy yielding him almost $10 million. The government also attacks various of the district court's statements in support of the sentence as without support or resting upon factors not properly considered.

We review sentences primarily for reasonableness, United States v. Booker, 543 U.S. 220, 261 (2005), asking whether the district court offered "a plausible explanation" and reached "a defensible overall result." United States v. Jimenez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007). Embedded factual findings in the sentencing determination are reviewed for clear error, United States v. Misla-Aldarondo, 478 F.3d 52, 70 (1st Cir.), cert. denied sub nom., Aldarondo v. United States, ___ S. Ct. ___, 2007 WL 1647161 (Oct. 1, 2007), while claims of strictly legal error are reviewed de novo. United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006).[1]

The government says that it is of no moment whether the proper guideline sentencing range was 87-108 (as the district court said) or 151-188 (as the PSR found).[2] Either range calls for a

---

[1] The Supreme Court's recent decision in Rita v. United States, 127 S. Ct. 2456 (2007) (holding that a presumption of reasonableness may be accorded to a sentence within the guidelines range) has no bearing on this case. Two cases are currently pending in the Supreme Court involving appellate review of district court departures from the Sentencing Guidelines. Gall v. United States, No. 06-7949 (argued October 2, 2007); Kimbrough v. United States, No. 06-6330 (argued October 2, 2007).

[2] The PSR calculated a total offense level of 34 based in part on Milo's distribution of between 3,000 and 10,000 kilos of

multi-year sentence and, without a motion, the statutory mandatory minimum would be 10 years; the sentence imposed amounts to almost no time in prison. The main question posed by the government's appeal is the adequacy, given circumstances and the court's explanation, of such a sentence for a major drug crime that is ordinarily heavily punished by a sentence of 10 to 15 years.

Three subsidiary government arguments warrant brief attention. The first is that the district court improperly relied on the large forfeiture order (ultimately $9.9 million), which by statute must be imposed "<u>in addition to</u> any other sentence imposed." 21 U.S.C. § 853(a) (emphasis added); <u>see also</u> 18 U.S.C. § 3554. But the statute does not say that the forfeiture can never be considered by the district court in determining the overall sentence, and here the forfeiture was calculated on estimated proceeds (not profits) and so has punitive characteristics.

At the same time, one could hardly give the forfeiture in this case much weight. Given his net worth of $2.5 million, Milo may never be able to pay the full forfeiture. And if Milo had independent means, avoiding a prison sentence on this account would create an appearance that financially successful criminals can buy

---

marijuana. U.S.S.G. § 2D1.1(c)(3). Apparently because Milo only admitted in the plea agreement to "over 1,000 kilograms" of marijuana, the court set the offense level at sentencing as 32, U.S.S.G. § 2D1.1(c)(4), yielding a range of 121-151 months. Then, the court used level 29, equating to a range of 87-108. The written judgment seemingly arrived at 29 by ignoring the three-level enhancement for role in the offense.

their way out of prison. See United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006); cf. United States v. Tom, ___ F.3d ___, 2007 WL 2822908 at *5-6 (1st Cir. Oct. 1, 2007). The district court did not rely heavily on the forfeiture, mentioning it only briefly, and we see no error in the district court's apparent decision to afford some minor weight to it.

Second, the government argues that the district court gave undue emphasis to Milo's charitable activities. These are a discouraged factor under the Sentencing Guidelines which provide: "Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. The government does not claim this reliance to be impermissible but merely to contribute to the unreasonableness of Milo's sentence.

Again, the district court did not place much weight on these activities to justify by themselves a lower sentence. Rather, the activities (which began after Milo's arrest and were real but not extraordinary) appear mainly to have bolstered the court's judgment that Milo had turned his life around, was genuinely and not just conveniently contrite and would not re-offend. This is perhaps an evidentiary use of post-arrest good works to show rehabilitation and colorably a legitimate inference,

if not overdone.³  We are not convinced that reliance on this factor was overdone here.

Third, the government suggests that Milo's episode of cocaine use in 2005 undermines the district court's finding that he was truly contrite and would not re-offend.  We agree that the cocaine use weighs against the finding that Milo had cleaned up his act; but the court's finding seemingly rested on Milo's overall behavior, his charitable works, the supporting letters, and the impression made by Milo in his elocution.  The finding that Milo is unlikely to re-offend by drug dealing is not clearly erroneous. See United States v. Robinson, 433 F.3d 31, 38 (1st Cir. 2005).

So we are brought back to the central question of the reasonableness of the sentence, now narrowed to focus on the two points most stressed by the district court: contrition and cooperation.  They present quite different problems.  The district court laid the most stress on contrition, including the unlikelihood of re-offense.⁴  We accept the finding that Milo's

---

³Previous decisions have said that little weight should be given to the charitable contributions of business leaders who "are often expected, by virtue of their positions, to engage in civic and charitable activities."  United States v. Thurston, 358 F.3d 51, 80 (1st Cir. 2004); see also United States v. Cooper, 394 F.3d 172, 176-77 (3d Cir. 2005).

⁴The government notes our opinion in United States v. Ahlers, 305 F.3d 54, 60 (1st Cir. 2002), holding that a district court may consider only a defendant's substantial assistance when imposing a sentence below the statutory minimum pursuant to the government's section 3553(e) motion.  However, the government says it "is not pressing this issue on appeal," because Milo would be entitled to

contrition was real: the issue is how far this warrants a very large reduction in sentence.

Milo received a three-level adjustment for acceptance of responsibility. The government says that therefore the law has already "to some extent" given him credit for contrition and that to wipe out the rest of his sentence on this ground underscores the unreasonableness of the sentence. But in practice over 90 percent of drug traffickers who plead guilty get a two or three level adjustment, whether truly contrite and unlikely to re-offend or not. U.S. Sentencing Commission, <u>2005 Sourcebook of Federal Sentencing Statistics</u>, tbl. 19.

Real contrition, and a low chance of re-offense, can be something more. From the standpoint of the public, re-offense is a major concern when a defendant is sentenced for a serious crime; and contrition is sometimes a proxy for a reduced likelihood of re-offense. The likelihood of re-offense depends on various factors in addition to contrition; but the factors are a set of variables regarding which, especially after <u>Booker</u>, the district court's judgment deserves weight.

Yet the <u>weight</u> given contrition cannot be beyond review for reasonableness. Full contrition and even a zero risk of re-offense engage major concerns of sentencing; incarceration is then

---

relief from the mandatory minimum under the section 3553(f) "safety valve," allowing the district court's consideration of Milo's contrition in relation to the mandatory minimum.

perhaps not needed to reform <u>that individual</u>, to protect the community <u>from him</u> and to deter <u>him</u> from committing new offenses. But punishment is also meant to deter others, affirming the seriousness of the crime and the penalties that others will likely face and the difficulty of avoiding punishment.

The need to deter others is under federal law a major element in criminal sentencing, 18 U.S.C. § 3553(a)(2)(B).[5] Given that objective, we do not see how, taken alone, or combined with the other factors described above, contrition could justify a judge in imposing what is effectively no prison time on someone like Milo who, without duress and simply for personal gain, operated a major marijuana ring involving a number of individuals over an extensive period and resulting in the distribution of thousands of pounds of marijuana.

Many first offenders in drug distribution cases--including young and impoverished women from other countries used to smuggle drugs on airplanes--must be desperately sorry when caught

---

[5] <u>See also</u> U.S.S.G. Ch. 1 Part A Introduction (2006) ("Most observers of the criminal law agree that the ultimate aim of the law itself, and of punishment in particular, is the control of crime."); <u>Pell</u> v. <u>Procunier</u>, 417 U.S. 817, 822 (1974) ("An important function of the corrections system is the deterrence of crime."); <u>United States</u> v. <u>Taylor</u>, ___ F.3d ___, 2007 WL 2349415 at *8 (1st Cir. Aug. 17, 2007), <u>petition for cert. filed</u>, No. 07-388 (U.S. Aug. 21, 2007); S. Rep. No. 98-225, at 91-92 (1983) (even if the defendant will not re-offend, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration [are] of critical importance").

and some probably could persuade judges that they would not re-offend. Yet if federally prosecuted, such individuals regularly receive substantial jail terms. To give no significant jail sentence on account of contrition to a major drug dealer, who has caused far more harm with far less excuse, would rarely seem reasonable.

Booker has added substantially to the latitude enjoyed by district judges, but some equality or proportionality of treatment is still an objective of sentencing and (save in very unusual cases) extremely wide deviations from the norm can impair that goal. See 18 U.S.C. § 3553(a)(6); United States v. Saez, 444 F.3d 15, 18 (1st Cir.), cert. denied, 127 S. Ct. 224 (2006). Further, the lack of any real prison sentence for what is a major crime would be very hard for the public to understand, and public confidence in enforcement of the law is itself a value. 18 U.S.C. § 3553(a)(2)(A).

Sentences with no (or trivial) prison time have been scrutinized severely on appellate review. Recently in United States v. Taylor, ___ F.3d ___, 2007 WL 2349415 (1st Cir. Aug. 17, 2007), this court vacated a sentence of one-year of community confinement for a defendant convicted of aiding and assisting in the preparation of false tax returns, which carried a guidelines

sentencing range of 30-37 months. Other first circuit cases are to the same effect.[6]

This circuit is hardly alone. For example, in United States v. Wallace, 458 F.3d 606, 612-14 (7th Cir.), petition for cert. filed, No. 06-7779 (U.S. Nov. 13, 2006), the Seventh Circuit vacated a sentence of six months of home confinement for a defendant convicted of wire fraud where the guidelines sentencing range was 24-30 months, the defendant demonstrated extraordinary remorse and lived an otherwise exemplary life, but where the district court failed to provide an adequate justification for an extraordinarily low sentence.[7]

Finally, the facts are unhelpful to Milo. He did not commit only a single criminal act on impulse or out of desperate need; instead, already earning a good living, he engaged in a large

---

[6] Tom, 2007 WL 2822908 (disallowing six months of community confinement and 36 months probation for insider trading and obstruction of justice carrying a guidelines range of 37-46 months); United States v. Thurston, 456 F.3d 211, 215-20 (1st Cir.), petition for cert. filed, No. 06-378 (U.S. Sep. 14, 2006) (overturning three-month sentence for Medicare fraud carrying a guidelines sentencing range of 63-78 months and a statutory maximum of 60 months); Smith, 445 F.3d at 5-7 (setting aside 46-month sentence for crack distribution carrying a guidelines sentencing range of 100-125 months).

[7] See also United States v. Repking, 467 F.3d 1091, 1094-96 (7th Cir. 2006) (vacating a one-day jail sentence and six months of home confinement for bank defrauder who substantially assisted the government); United States v. Saenz, 428 F.3d 1159, 1162-65 (8th Cir. 2005) (vacating a 20-month sentence for defendant convicted of marijuana distribution where the guidelines range was 63-78 months, and defendant assisted the government).

number of drug transactions over a substantial period, even though the government chose to charge them as a single conspiracy count. In sum, the problem with contrition as justifying so low a sentence is not the lack of explanation by the district court; it is the result.

Milo's cooperation is an entirely different matter. One thing that both statute and guidelines do reward is helping the government. This is not because helping necessarily shows contrition or other virtues (although it might be evidence) but because, in the view of Congress and the Sentencing Commission, assisting law enforcement is often critical to detecting and deterring crime, and punishing offenders.[8] In this grim calculus, drug kingpins may suffer little while subordinates serve long sentences.

Once the government moves under the guidelines or statute based on substantial assistance, the district court is not bound by the government's recommendation as to how much of a reduction is proper. United States v. Martin, 455 F.3d 1227, 1235 (11th Cir. 2006); United States v. Mariano, 983 F.2d 1150, 1157 (1st Cir. 1993); U.S.S.G. § 5K1.1(a). But there are reasons for giving

---

[8] See United States v. Mariano, 983 F.2d 1150, 1155 (1st Cir. 1993); Frank O. Bowman, III & Michael Heise, Quiet Rebellion? Explaining Nearly a Decade of Declining Federal Drug Sentences, 86 Iowa L. Rev. 1043, 1117 (2001); John R. Steer & Paula K. Biderman, Impact of the Federal Sentencing Guidelines on the President's Power to Commute Sentences, 13 Fed. Sent'g Rep. 154, 155 (2000-2001).

weight to its recommendations and, like any other factor relied on by a sentencing judge, the judge's own adjustment is reviewable for reasonableness. Jimenez-Beltre, 440 F.3d at 518.

Two central realities have to be considered: first, that the adjustment is usually a discount from the <u>otherwise appropriate sentence</u> and, second, that the discount itself has costs: in reducing protection of society from the defendant, in deterring others, in lessening public confidence in the law's insistence on just deserts, and in undercutting equal treatment vis-a-vis those who similarly offended but happen to have nothing to trade.

Congress, the Sentencing Commission and most judges think that the benefits of cooperation are worth paying a price; but because the costs are inherent, the public interest often suggests discounting the defendant's sentence no more than is necessary to elicit the needed help. In any event understanding this tension between costs and benefits helps explain why a zero jail-time sentence for a major crime is highly suspect and also why the prosecutor's judgment as to the right discount, if not impeached, is worth careful attention.

Ordinarily, one facing a long prison sentence has a strong incentive to cooperate in exchange for a reduced sentence. How to measure cooperation is not straightforward. Partly to assure real and not half-hearted cooperation, the government wants to correlate the discount with results and results vary; the

defendant wants compensation for the costs entailed by cooperation, especially danger, also a variable. Still, usually needed assistance can be elicited by some discount well short of 100 percent.

Published data on the distribution of reductions tends to be gross, but the most recent median decrease below the guidelines minimum in drug trafficking cases where there was a 5K1.1 substantial assistance motion was 40 months or 43.5 percent below the guideline minimum. U.S. Sentencing Commission, 2006 Source of Federal Sentencing Statistics, tbl. 30; see also 2005 Source of Federal Sentencing Statistics, tbl. 30 (38.5 months or 46.2% below the guidelines minimum). Here, the government's recommendation as to Milo was in line with such data.

True, a prosecutor could overvalue or undervalue the cooperation provided; the prosecutor's interest in the immediate benefits of cooperation may suggest that the former is the greater danger.[9] But in general the government has both incentive and expertise to recommend what is needed to secure cooperation. And both the prosecutor and defense counsel in a district benefit from

---

[9] See, e.g., Michael A. Simons, Retribution for Rats: Cooperation, Punishment, and Atonement, 56 Vand. L. Rev. 1, 23-24 (2003) (noting risk of prosecutor's overvaluing of additional convictions and undervaluing of general deterrence); Ian Weinstein, Regulating the Market for Snitches, 47 Buff. L. Rev. 563, 564-65 (1999) (arguing that prosecutors and defendants do not internalize the social costs of cooperation--such as increased sentencing disparities).

a stable and predictable set of likely adjustments based on help provided and danger entailed.

Where minimal prison sentences have been imposed in major drug cases based on cooperation, circuit courts have not been reluctant to overturn them.[10]  At the very least, where a district court varies widely from the government's recommendation in the "substantial assistance" context, the district court should have some good explanation as to why it values the defendant's cooperation far more highly than did the government.  See United States v. Dalton, 404 F.3d 1029, 1033 (8th Cir. 2005).

In this case, Milo gave substantial help to the government, and one can infer that some risk was involved.  But the government ordinarily insists on results to justify any assistance reduction; results will often involve risks; and the district court said nothing of substance here to explain why the result or the risk in this case warranted a near-zero sentence.  Indeed, assistance was stressed less than contrition, and contrition was not justification for so low a sentence.

---

[10]See United States v. Desselle, 450 F.3d 179, 181 (5th Cir. 2006), cert. denied, 127 S. Ct. 1148 (2007) (reversing an 87-month sentence for money laundering and cocaine distribution where guidelines range was 262-327 months and the government 5K1.1 motion recommended an adjusted range of 210-262 months); United States v. Coyle, 429 F.3d 1192 (8th Cir. 2005) (reversing a 36-month sentence for methamphetamine distribution, where guidelines range was 135-168 months, and the government recommended a 15% reduction for defendant's cooperation).

So far as based on assistance, the facially surprising sentence in this case lacks the "plausible explanation" needed under <u>Jimenez-Beltre</u>. Even taking account of both cooperation and contrition, it is far from clear that adequate basis could be furnished for a near-zero prison sentence. Anyway, explanation, or the choice among sentences meaningfully above the zero level, are in the first instance matters for the district judge on remand.

The sentence is <u>vacated</u> and the matter <u>remanded</u> to the district court for further proceedings consistent with this decision. If Milo is not a flight risk, the district court may let him remain free pending re-sentencing on such terms as the district court thinks proper.

<u>It is so ordered.</u>